Argued and submitted November 19, affirmed December 29, 1982, respondent Employment Relations Board's and petitioner Department of Commerce's reconsiderations granted, former opinion adhered to March 30 (62 Or App 433, 661 P2d 119), petitions for review denied November 1, 1983 (295 Or 841)

PAYNE,
*Respondent,*
*v.*
DEPARTMENT OF COMMERCE,
*Petitioner,*
EMPLOYMENT RELATIONS BOARD,
*Respondent.*

(No. 1294, CA A24178)

656 P2d 361

Christine L. Dickey, Assistant Attorney General, Salem, argued the cause for petitioner. With her on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

David Allen Filer, Salem, argued the cause for respondent Tommy G. Payne. On the brief was Harold W. Adams, Salem.

J. Michael Alexander, Salem, argued the cause for respondent Employment Relations Board. With him on the brief was Brown, Burt, Swanson, Lathen & Alexander, Salem.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Petitioner seeks reversal of the Employment Relations Board's (ERB) invalidation of petitioner's dismissal of its employe, Payne.[1] ERB based its decision on its conclusion that petitioner's pre-termination notice to Payne violated a state personnel rule, Rule 81-605; and that that violation invalidated Payne's subsequent dismissal. Petitioner contends that ERB erred in three respects: (1) the pre-termination notice was sufficient to comply with the rule; (2) even if the notice was insufficient, any such error on petitioner's part was cured by the full and fair post-termination hearing accorded Payne; and (3) in any event, the remedy ordered by ERB—reinstatement—exceeded ERB's authority. For reasons that differ somewhat from those advanced by ERB, we affirm its order.

Payne was employed by petitioner as a Plumbing Inspector in the Building Codes Division. His primary duty was to inspect recreational vehicles, either during the manufacturing process or on dealer lots, for plumbing, electrical and mechanical code compliance. To perform his duties, he traveled statewide in a state vehicle from manufacturer to manufacturer, making inspections as necessary. There are approximately 23 manufacturers, many of whom Payne was required to contact at least once a month. As an inspector, he had authority to approve or reject plans on the basis of code compliance.

Petitioner had a written conflict of interest policy, which was issued in June, 1977. The policy stated, in relevant part:

"(4) 'Potential conflict of interest' means any transaction where a person acting in a capacity as a public official takes any action * * * the effect of which would be to the person's private pecuniary benefit. * * *" *See also* ORS 244.040.

Petitioner's policy also prescribed a procedure for handling potential conflicts:

"(1) When involved in a potential conflict of interest, a public official shall:

---

[1] Payne is a respondent in this case, as is ERB. All parties have briefed the matter, but Payne's brief is of no assistance. Because there are multiple respondents, we use the designations "Payne" and "ERB."

"* * * * *

"(d) [n]otify in writing the person who appointed him to office of the nature of the potential conflict, and request that the appointing authority dispose of the matter. * * *"

A statement filed by petitioner with the Oregon Ethics Commission characterizes petitioner's philosophy toward conflicts of interest:

"It is the policy of the Department that, in the area of real or potential conflicts of interest, the employes not only be clean, but look clean."

Petitioner's statement enumerated as an example of a prohibited conflict the following:

"No employe shall voluntarily enter into any transaction or business relationship with a regulated person if that regulated person has any discretionary power in regard to the terms or conditions of the transaction unless the employe has the written permission of the Director. This paragraph does not apply to the purchase of goods or services from a regulated person at the prevailing posted terms and price (whether set in terms of dollars or percentage of value) when such terms and price are not subject to negotiation."

Payne received a copy of the written conflict of interest policy shortly after he was hired. He acknowledges that, at the time of the incident in question, he understood the policy.

Payne also had specific knowledge of petitioner's policy with respect to potential conflicts of interest because of certain incidents that had occurred before the one involved here. In 1978, he had transported another employe to a regulated industry where that employe purchased a recreational vehicle. Although petitioner's investigation revealed no intentional wrongdoing on Payne's part, he was counseled to avoid engaging in business transactions with regulated persons and to report immediately any potential conflict of interest dealings. On another occasion involving the attempted purchase of a damaged vehicle and some jacks from a surplus dealer, he was again counseled to avoid business transactions with regulated industries.

During 1980, Payne acquired two damaged propane tanks from a regulated business, Caribou Manufacturing. The propane tanks were surplus stock that Caribou was

selling at a reduced price. Payne paid $10 apiece for the tanks. The price of $10 was not in fact negotiated; however, the price was not posted and was negotiable. Shortly thereafter, Payne approached the owner of U. S. Cruiser, another regulated business, and offered to sell him the propane tanks for $50 apiece. The offer was accepted. Payne also asked the owner whether he was interested in carpeting, thus suggesting Payne had some available. No carpet was purchased.

Payne also talked to other regulated persons about buying propane tanks in late 1980 (after he had purchased several more tanks from Caribou Manufacturing at the same price), including conversations with the management of Pacific Remanufacturing, another regulated entity. On the first such occasion, Payne approached the company's assistant manager and asked whether he was interested in propane tanks. Payne indicated that he had tanks available for sale at $50 apiece. On the second occasion, Payne showed the assistant manager of Pacific Remanufacturing some carpet samples and indicated that carpet was available for $5 a yard. He did not indicate that it was available from Caribou, but as a practical matter the assistant manager knew that the carpet was part of Caribou's closeout sale. The assistant manager of Pacific Remanufacturing was not interested, and no sales were consummated.

Payne also contacted Ralph Hildula, the owner of Vandicraft, Inc., another regulated entity. He told Hildula that he had "propane tanks and other merchandise" available at a good price. When asked by Hildula where the merchandise came from, Payne replied that they were available through him. No sale occurred. On still another occasion, Payne offered propane tanks for sale to Bob Magid of the Rough Rider Company, another regulated business. Magid, however, felt that Payne was not, by offering the item for sale, attempting to use his position for personal gain.

In the course of engaging in the foregoing transactions and contacts, Payne transported items such as propane tanks and carpet samples in the trunk of his state car. He did not reveal the transactions to his superiors.

The sales and attempted sales came to petitioner's attention, and an investigation was conducted. Payne was suspended pending pre-dismissal process on April 29, 1981. By letter of the same date, petitioner notified Payne of the charges against him but did not divulge the source of its information, the identity of the persons he had allegedly contacted, the dates involved or the kind of material allegedly sold or offered for sale. During his pre-dismissal hearing Payne was given an opportunity to "respond" to the charges but was not given any more specifics about the complaints against him. Petitioner's refusal to divulge specifics of the complaints was based on advice of counsel. At the hearing, Payne repeatedly complained about the lack of specifics in the notice, stating that he could not answer the charges without more information. When questioned during the hearing about selling any merchandise to regulated persons or businesses, he denied that he had done so. With respect to his dealing with Caribou Manufacturing, Payne acknowledged only purchasing two tanks, both of which he said he kept for personal use.

The pre-termination notice to Payne on April 29, 1981, provided, in pertinent part:

> "*Charges and Complaints:* 1. Approximately one year ago you obtained recreational vehicle-related merchandise either by purchase, consignment or other type of receipt. 2. You attempted to sell recreational vehicle merchandise, while performing your inspection duties, on at least four occasions to various R.V. businesses inspected by you in the normal course of your duties. 3. You also transported this merchandise in the trunk of your State car on at least one of these four occasions. 4. You have concealed from your supervisors the fact that you engaged in business transactions with such regulated business firms or plant owners; that you offered the merchandise for sale during work hours and on State travel status; and that you were transporting some of this merchandise in a State car. 5. You failed to report your potential conflict of interest."

ERB found that this pre-termination notice was insufficient to comply with Personnel Division Rule No. 81-605:

> "A written pre-dismissal notice shall be given to a regular status employe against whom a charge is presented. Such notice shall include the known complaints, facts and

charges and a statement that the employe may be dismissed. The employe shall be afforded an opportunity to refute such charges or present mitigating circumstances to the appointing authority or his designee * * *."

Petitioner argues in this court that the notice was sufficient. We agree with ERB.

■        Because of the variety of circumstances that can lead to the dismissal or proposed dismissal of a regular status employe, it is obvious that the required degree of specificity of a notice will vary considerably according to circumstances. However, because the rule specifically contemplates that the "employe shall be afforded an opportunity to refute such charges," it necessarily contemplates that the employe will be given sufficient information so that he can know precisely what it is he will need to refute in order to avoid potential employer action against him, including dismissal. We hold that the rule requires that the employe be informed in the pre-termination notice of each material fact then in the knowledge of the employer that is a part of the basis for the employer's decision to consider termination or other appropriate personnel action. This means that, at a minimum, when the charges against the employe arise out of particular unlawful or otherwise improper acts by the employe, those acts must be described with sufficient particularity to enable the employe to identify and respond to them. That will usually require that the employe be notified of the dates in question, the alleged improper acts and the other persons (if any) involved.[2]

■        Examined in light of the foregoing, the pre-termination notice given to Payne is clearly insufficient. It does in general terms notify him of the charges against him, but it does not identify the dates when the alleged wrongful acts were supposed to have occurred, the persons and regulated industries that Payne is supposed to have contacted, or the kinds of materials allegedly sold or

---

[2] We believe the foregoing formulation is more specific than, but not in principle different from, ERB's own explanation of the rule:

"As a general matter, * * * we can say that if the nature of the information is such that to withhold it would be likely to significantly diminish or impair the employe's ability to *refute* the charges or *offer mitigation,* then the information must be included in the notice." (Order of ERB at 7; emphasis in original.)

offered for sale. It follows that ERB's conclusion that the pre-termination order violated the requirements of Rule 81-605 was correct.

Petitioner next contends that, if Rule 81-605 was violated by the form of pre-termination notice, the violation was "cured" by the extensive post-termination hearing afforded Payne, at which he was fully apprised of all of the specifics of the charges against him and was given a complete opportunity to refute them. In making this argument, petitioner relies on our decision in *Ashman v. Children's Services Division,* 37 Or App 865, 588 P2d 665 (1978). In *Ashman,* we said with respect to another, related personnel division rule:

> "* * * [W]e fail to see how the defects in procedure, if any, under [the analogous rule] prejudice defendant when he was accorded a full evidentiary hearing before ERB after his dismissal. *See Arnett v. Kennedy,* 416 US 134, 170, [94 S Ct 1633,] 40 L Ed 2d 15, 42 (1974). A procedural defect which does not prejudice substantial rights of petitioner is not cause for reversal. ORS 183.482(8)(a)." 37 Or App at 872-73. (Footnote omitted.)

Although our ruling on the issue in *Ashman* was correct, its statutory citation was wrong. Former ORS 183.482(8)(a),[3] the statute relied on in *Ashman,* was a section of the Administrative Procedure Act governing review *by this court* of contested case decisions of agencies. It provided:

> "(8) The court may affirm, reverse or remand the order. *The court shall reverse or remand the order only if it finds:*
>
> "(a) The order to be unlawful in substance or procedure *but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby * * *."* (Emphasis supplied.)

What we failed to do in *Ashman* was to differentiate *our* role in reviewing an agency decision—in that case, also, a decision of ERB—and ERB's role in reviewing another administrative agency's decision to dismiss a regular status

---

[3] Former ORS 183.482(8)(a) has since been amended; its substance is now found in ORS 183.482(7).

employe. That is, the standard of review by which we purported to analyze the *Ashman* case was one that was applicable only to our review of ERB's action, but we applied it as if it also were an enunciation of the standard by which ERB should have reviewed the other agency's action.

Rather than conducting our review in *Ashman* under the emphasized portion of former ORS 183.482(8)(a), we should, instead, have reviewed it under other language of the same section:

"* * * [T]he court shall reverse or remand the order only if it finds:

"(a) The order to be unlawful in substance or procedure * * *."

To determine whether or not the order was unlawful "in substance," this court should have referred to the organic statute under which ERB purported to act. The latter former ORS 240.560,[4] provided:

"(1) A regular employe who is reduced, dismissed, suspended or demoted, shall have the right to appeal to the board * * *.

"(2) The hearing shall be conducted as provided for a contested case in ORS 183.310 to 183.550.

"(3) If the board finds that the action complained of was taken by the appointing authority for any political, religious or racial reasons, or because of sex, marital status or age, the employe shall be reinstated to his position and shall not suffer any loss in pay.

"(4) In all other cases, *if the board finds that the action was not taken in good faith for cause,* it shall order the immediate reinstatement and the reemployment of the employe in his position without the loss of pay. The board in lieu of affirming the action, may modify it by directing a suspension without pay for a given period, and a subsequent restoration to duty, or a demotion in classification, grade or pay. * * *" (Emphasis supplied.)

Both *Ashman* and this case were cases considered under subsection (4) of ORS 240.560. As we read the operative language, ERB may set aside or otherwise modify

---

[4] The statute was twice amended in 1977, but neither amendment affected the provisions pertinent to the *Ashman* case or to our consideration here.

a personnel action only if it finds that the action was not taken "in good faith for cause." In making this determination, it is self-evident that procedural errors in the agency's handling of dismissal do not, *a fortiori,* having anything to do with that question. In fact, there was no suggestion in *Ashman* and there is no suggestion in this case, that the failure to comply with particular personnel rules was a reflection of any bad faith on the part of the employing agency. Thus, our quoted statement in *Ashman,* 37 Or App at 872-73, should have concluded with the following sentence:

> "A procedural defect that does not prejudice substantial rights of petitioner is not a basis on which ERB or this court could set aside a dismissal, because the organic statute of ERB does not authorize such a disposition. ORS 240.560(4)."

■ ■ In setting aside the dismissal on the basis of violation of a rule in the present case, ERB noted in footnote 22 of its opinion:

> "Our conclusions on the notice issue may well exalt form over substance. Mr. Payne clearly admitted the acts complained of, and just as clearly those acts warrant dismissal. Moreoever, it is difficult to see how Payne was actually harmed by respondent's failure to provide more specific notice (*i.e.,* comply with the rule). * * * Nevertheless, we do not believe that noncompliance with a rule intended to afford 'due process' notice can be ignored on the basis that such noncompliance was ultimately shown to be prejudicial. * * *" (Citations omitted.)

As a matter of policy, ERB's statement may or may not have been correct; we are not called to pass on that question. What it failed to observe, however, was the limitation on its own authority. An agency may not act outside its statutory authority. *Board of Comm. of Clackamas County v. LCDC,* 35 Or App 725, 582 P2d 59 (1978). ERB is not statutorily authorized to set aside a dismissal for failure of the dismissing agency to comply with a personnel rule. Therefore, its action here, on the basis it asserted, was outside its authority and improper. There remains, however, the question of whether the action may be sustained on another ground.

Payne asserted before the Board that the pre-termination notice he received denied him his right to due process under the Fourteenth Amendment to the United States Constitution, relying on *Hammer v. OSP,* 276 Or 651, 556 P2d 1348 (1976), *vacated* 434 US 945, 98 S Ct 469, 54 L Ed 2d 306 (1977), *aff'd on remand* 283 Or 369, 583 P2d 1136 (1978), and *Tupper v. Fairview Hospital,* 276 Or 657, 556 P2d 1340 (1976). The issue before the Oregon Supreme Court in *Tupper* and *Hammer* cases was the kind and extent of pre-termination notice required before a regular status public employe can be terminated. The court considered the rules enunciated in a number of cases, and particularly those in *Arnett v. Kennedy, supra,* and *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976). In *Tupper,* the court said:

"* * * Therefore, on the basis of *Arnett v. Kennedy, supra,* and in view of the competing interests involved in these cases, we conclude that in addition to his full post termination hearing Tupper was entitled to the following procedural safeguards prior to his dismissal. First, he should have been notified of the charges against him. Second, he should have been informed of the kinds of sanctions being considered. Third, he should have been given at least an informal opportunity to refute the charges either orally or in writing before someone who is authorized either to make the final decision or to recommend what final decision should be made." 276 Or at 665. (Footnote omitted.)

We explained the meaning of the *Tupper* and *Hammer* decisions in *Ashman v. Children's Services Division, supra:*

"* * * All that *Tupper* and *Hammer* require is that an employee receive notice of the charges, notice of the possible sanctions and, at minimum, an informal opportunity to respond to the charges prior to dismissal. * * * In its simplest form, the employee is to be informed of the charges and given the chance to say 'I did not do that.' * * *" 37 Or App at 872.

A fair reading of the pre-termination notice given to Payne in this case shows that the charges against him were not sufficiently spelled out so that he might be prepared even to say, "I did not do that." Without some knowledge of the dates and parties involved and the kind of inappropriate activity in which he is suppose to have

engaged, Payne could not have stated "I did not do that" with any certainty. We hold that the pre-termination notice given to Payne in this case did not comply with the due process requirements enunciated in *Tupper* and *Hammer* and explained in *Ashman*. Under such circumstances, the appropriate disposition of the case is to set aside the dismissal, precisely the action which the ERB took in this case. *Hammer v. OSP, supra,* 276 Or at 655; *Tupper v. Fairview Hospital, supra,* 276 Or at 665.

Affirmed.